MARIE HANLIN AND THE UNION TRUST COMPANY OF PITTSBURGH, EXECUTORS OF THE ESTATE OF BELLE C. HERSHMAN MARTINEK, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 79112. Promulgated October 11, 1938,

*Joseph G. Robinson, Esq.,* for the petitioners.
*Harold D. Thomas, Esq.,* for the respondent.

---

# 812

DISNEY: The Commissioner determined a deficiency of $7,983.19 in income tax of the estate of Belle C. Hershman Martinek, deceased, for 1932. He disallowed the deduction of an ordinary loss from the sale of bonds of the city of Philadelphia and of a capital loss from the sale of Federal Land Bank bonds, with the following explanation:

These disallowances are based upon section 118 (a) of the Revenue Act of 1932, which provides that no loss shall be allowed from the sale of securities where, within a period of thirty days, substantially the same kind and character of securities were repurchased by the taxpayer.

The facts are in general not in dispute. The decedent died on March 13, 1933. On February 7, 1931, she created a revocable trust. On November 27, 1931, she transferred to the trustee $125,000 par value city of Philadelphia 4½ percent bonds which had, by distribution dated October 30, 1931, been received by her from the residuary estate of Oliver C. Hershman, who died July 9, 1930. All of these bonds were issued in 1918, pursuant to a city ordinance of June 29, 1916; $60,000 were to mature on May 1, 1948, and the remaining $65,000 on November 1, 1948. On December 8, 1932, the trustee sold $50,000 par value of these bonds at a unit price of 89; on December 14, he sold $25,000 par value at 88; and on December 28, he sold $50,000 par value at 86½. The net sales proceeds aggregated $109,-437.50, and the trust thereby sustained a loss of $10,723.50. On the same dates and at the same unit prices, the trustee purchased bonds of the city of Philadelphia of the same respective par values, authorized by the same city ordinance, bearing the same rate of interest, and to mature on March 1, 1949.

On November 27, 1931, the decedent transferred to the trustee bonds of the Federal Land Bank of Omaha, purchased by her on July 18, 1923, of a par value of $100,000, which bore 4½ percent interest, were to mature on July 1, 1953, and were redeemable on or after July 1, 1933. On December 14, 1932, the trustee sold them at a unit price of 87½, the net proceeds being $87,500 and the loss $12,750. On the same date and at the same unit price, he purchased $100,000 par value 4½ percent bonds of the Federal Land Bank of Omaha, maturing on January 1, 1956.

On November 27, 1931, the decedent transferred to the trustee bonds of the Federal Land Bank of Louisville, which bonds had been purchased by her on November 26, 1923. The Louisville bonds had a par value of $50,000, bore 4¾ percent interest, were to mature on July 1, 1953, but were redeemable on or after July 1, 1933. On December 14, 1932, the trustee sold them at a unit price of 89¾, the

net proceeds being $44,875 and the loss $5,000. On the same date and at the same unit price he purchased $50,000 par value 4¾ percent Federal Land Bank bonds, maturing on January 1, 1954, $19,000 par value thereof having been issued by the Federal Land Bank of St. Louis and $31,000 par value thereof having been issued by the Federal Land Bank of Wichita. Of the St. Louis bonds $10,000 par value were redeemable at any time after January 1, 1934. All of the St. Louis and Wichita bonds had been issued not later than July 1, 1932 (as shown by computation of interest from that date).

The language of section 118 (a) of the Revenue Act of 1932, is set forth in the margin.[1]

The losses upon the sales in December 1932 were capital losses, some of the bonds having been purchased in 1923, and the remainder having been "held", under section 101 (c) (8) of the Revenue Act of 1932, since July 9, 1930, the date of death of Oliver C. Hershman, and not merely from October 30, 1931, the date of distribution by his estate. *McFeely* v. *Commissioner*, 296 U. S. 102.

## The Philadelphia Bonds.

The only dispute as to the facts as to the Philadelphia bonds is as to difference in interest dates and as to dates of issuance of the bonds purchased. The petitioner argues that the bonds sold and those purchased differed as to interest dates, likewise as to dates of issue, in that the bonds purchased were issued in 1919, whereas it is agreed that the bonds sold were issued in 1918. The record fails to show either that there was difference in interest dates or that the bonds purchased were issued in 1919, and since there was no agreement in regard to these points, we are confined to a consideration of a difference only in maturity, respondent's determination of substantial identity being presumed correctly to negative any other differences.

The question to be decided is whether the sale of Philadelphia 4½ percent bonds issued in 1918 under a certain ordinance of June 29, 1916, and maturing in 1948, and the purchase within 30 days thereafter of Philadelphia 4½ percent bonds issued under the same ordinance, maturing four or ten months later in 1949, but otherwise

---

[1] SEC. 118. LOSS FROM WASH SALES OF STOCK OR SECURITIES.

(a) In the case of any loss claimed to have been sustained from any sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the taxpayer has acquired (by purchase or by an exchange upon which the entire amount of gain or loss was recognized by law), or has entered into a contract or option so to acquire, substantially identical stock or securities, then no deduction for the loss shall be allowed under section 23 (e) (2) ; nor shall such deduction be allowed under section 23 (f) unless the claim is made by a corporation, a dealer in stocks or securities, and with respect to a transaction made in the ordinary course of its business.

identical, was a statutory wash sale which prevents the deduction of a loss—and this depends on whether, for the purpose of the statute, the bonds purchased and the bonds sold were substantially identical. They were not identical; but were they *substantially* identical? The statutory expression, and not that used by respondent in the notice of deficiency, is of course to be construed.

The statute is not as such ambiguous. The difficulty lies in its application to particular facts due to the indefiniteness of the expression "substantially identical." Interpretation calls therefore for an application of the rule that the legislature must be presumed to use words in their known and ordinary signification. *Levy's Lessee v. McCartee*, 6 Pet. 102, 110; *Old Colony Railroad Co.* v. *Commissioner*, 284 U. S. 552.

If the wash sale provision had contained the word identical without qualification, it could have been literally applied without much difficulty; because its meaning is clear in common usage, in law generally, and in revenue law. This was the form in which the wash sale provision first appeared in the draft of the 1921 House bill.[2] As to it, the House Committee on Ways and Means said in its report:

Section 214 would limit the deductions for losses by providing that no deduction shall be allowed for losses sustained in the sale of securities where the taxpayer at or about the time of such sale purchases identical securities. This change will, if adopted, prevent evasion of the tax through the medium of wash sales. [H. R. Rept. No. 350, 67th Cong., 1st sess., p. 11.]

The Senate bill incorporated the word substantially, although the Finance Committee report says nothing about it.[3] The Conference Committee adopted the change without comment. The Revenue Act of 1921, as enacted, used the words substantially identical, and succeeding statutes have made no change. There is no aid to construction available in the legislative reports. The word "substantially" must be construed in the light of the intendment of the whole provision. The term "substantially identical" is looser than "identical", and was unquestionably, so intended; but the retention of the word

---

[2] SEC. 214. Paragraphs (5), (6), and (7) of subdivision (a) of section 214 of the Revenue Act of 1918 are amended to read as follows:

"(5) * * * No deduction shall be allowed under paragraphs (4) and (5) for any loss claimed to have been sustained in any sale or other disposition of shares of stock or securities made after the passage of the Revenue Act of 1921 where it appears that at or about the date of such sale or other disposition the taxpayer has acquired identical property in the same or substantially the same amount as the property sold or disposed of. If such new acquisition is to the extent of part only of identical property, then the amount of loss deductible shall be in proportion as the total amount of the property sold or disposed of bears to the property acquired;" [H. R. 8245, 67th Cong., 1st sess. (Aug. 15, 1921), p. 17.]

[3] Section 214 allows substantially the same deductions in computing net income as are authorized under existing law, but adds the following provision: * * * (3) to prevent evasion through the medium of wash sales, it is provided that no deduction shall be allowed for losses sustained in the sale of securities where it appears that within 30 days after such sale the taxpayer purchases identical securities; * * *

"identical" and the testimony before the Senate Finance Committee clearly indicates that approximation to identity, and not mere similarity, was the controlling thought. The word substantially was added to prevent an emasculation of the provision. Thus a sale of common shares and the purchase of certificates immediately convertible into such common shares might have escaped the wash sale restriction if tested by identity, but not if tested by substantial identity. See *Margaret E. Kidder*, 30 B. T. A. 59; I. T. 2292, C. B. V–1, p. 12 (1926). On the other hand, there would have been no identity of shares of one corporation with the shares of another corporation holding them, *Seymour H. Knox*, 33 B. T. A. 972.

The petitioner refers to I. T. 1365, C. B. I–1, p. 151, as to Liberty bonds of the second and fourth issues. Therein appeared difference in market value and date of issuance, in addition to difference in maturity. What differences, if any, cause the difference in market value, does not appear. I. T. 2585, C. B. X–2, p. 182, also cited, involved the generally recognized difference between voting stock and nonvoting stock in the same corporation. I. T. 2672, C. B. XII–1, p. 72, likewise relied upon, involved different interest dates, different values, and different dates of issuance, in addition to different dates of maturity. I. T. 2778, C. B. XIII–1, p. 79, cited as involving an example of bonds clearly identical, shows differences in date of issue and in amount redeemable annually, though date of maturity and rate and dates of payment of interest were the same; also, the bonds received in exchange were issued under a supplement to the indenture under which those exchanged were issued. It thus appears that none of the above situations is parallel with the instant matter, wherein difference only in date of maturity must be relied upon as negating substantial identity. The present question has not heretofore been clearly met. The regulations promulgated by the Commissioner do not assist. Difference in maturity date of bonds is clearly an element in the construction of the term "substantial identity."

It does not, however, constitute *per se* a negation of substantial identity; that would be to allow any difference whatever in maturity, e. g., one day, to be effective and patently to vitiate the statute and defeat its essential purpose. Nor can a rule consonant with the remedy sought by the statute be established upon a concept that substantial identity does not exist unless the difference in maturity is negligibly slight. To do so would be to disregard the rationale of our opinions in various cases involving consideration of the expression "substantially all" applied to the amount of stock necessary for control of corporations, and to the amount of property involved in reorganizations, wherein we have construed "substantially all" not to be negatived by a merely negligible quantity as to stock or property.

Among other cases, in *Brownsville Ice & Storage Co.*, 18 B. T. A. 439, we considered "substantially all" not avoided by 8 percent of stock necessary for control of a corporation under section 240 (c), Revenue Act of 1921, and in *Western Industries Co.* v. *Helvering*, 82 Fed. (2d) 461, it was held that absence of what the Board had found was not less than 15 percent of property did not prevent application of "substantially all" under section 203 (h) (1) (A) of the Revenue Act of 1926. In *Arctic Ice Machine Co.*, 23 B. T. A. 1223, 1228, we relied upon the analogy between the expressions in the two statutes. There is the same analogy here. Two things which are identical are 100 percent the same. "Substantially identical" plainly means identical in "substantially all" respects, i. e., substantially 100 percent the same. "All" is no more an absolute than is "identical." "Identical is the strictest term for entire and absolute agreement or negation of difference."— Webster's New International Dictionary. Yet above we see that we have plainly considered that a *substantial* approximation to the absolute "all" was satisfied when there was considerably more than a mere negligibility in difference. What amount of difference prevents substantial identity? An elastic term has been used by Congress as to stock control, as to property in reorganization, and here as to identity of securities, and "the very use of elastic terms indicates an intent to have them construed flexibly in the light of the peculiar circumstances in each particular case." *Rishell Phonograph Co.*, 2 B. T. A. 229. In *Great Lakes Hotel Co.* v. *Commissioner*, 30 Fed. (2d) 1, it is said:

"Substantially all the stock" is a lax, indefinite expression, which, under the rulings of the board, is equivalent to "a large majority." Its limitations cannot be defined with exactness or certainty. * * *

In *United States* v. *Whyel*, 19 Fed. (2d) 260, it is held:

The term "substantially all the stock" clearly indicates, not a definitely fixed amount of percentage, but is a somewhat elastic term, which must be construed according to the facts of the particular case. * * *

To the same effect are *Brownsville Ice & Storage Co.*, *supra*, and *Commissioner* v. *Hirsch & Co.*, 30 Fed. (2d) 645.

"Substantially" has perhaps no better definition than "in the main", as given by the New Century Dictionary and Encyclopedia. In *Gibson* v. *Glos*, 111 N. E. 123, there was considered the question of a statutory expression, "substantially the same chain of title." Just as here the statute has been amended by the addition of "substantially" to "identical", there it had been amended by addition of "substantially" to "the same chain of title." Under the previous statute it had been held in *Culver* v. *Waters*, 93 N. E. 747, that "same" meant "identical." Holding that it was "evident that by the amendment the Legislature intended to relax the strict requirement of the former statute" the court also defines substantially as "in the main." Ap-

plying such definition generally, it is plain that the Philadelphia bonds herein involved were *in the main* identical, being so identical in par value, unit selling price, interest rate, date of issuance and authorizing ordinance, and lacking identity in only one characteristic out of several. Under such circumstances and within the above definition, difference in maturity standing alone, might, regardless of amount of difference, be considered so relatively unimportant as to be disregarded in considering substantial identity. But assuming that the nonidentical characteristic, maturity date, could of itself be regarded, as a generality, of such comparative importance as to prevent application of the above general definition "in the main", and therefore further examining that element of difference here, we are still constrained to examine it as to whether the amount of difference in maturity here involved effects a difference substantially or in the main in the bonds. The distinction between the bonds is patently not substantial as a matter of mathematical comparison of duration of life of bonds and amount of difference in maturities, for the percentage or proportion of difference in duration between the bonds is much less than the difference in percentage in amounts of stock or property allowed as a deviation from 100 percent involved in the statutes and cases referred to above. Upon the authority of those cases, we conclude that there was no substantial abstract mathematical difference in mere life duration of the bonds, i. e., in their maturity.

If, however, we consider the matter other than quantitatively, it seems plain that examination must be from the standpoint of normal investor and normal obligor. We are unable to discern any interest on the part of any other, but if such interest could be conceived, it would be so inconsequential as not to affect our consideration here, and we shall confine our thought to obligor and obligee of the bond as the norm to be regarded. In what do the bonds here being considered differ substantially for either obligor or obligee as to maturity (other than mere *amount* of difference above discussed)? The maturities are remote, that is one bond has a life or permanence differing from the other bond only in a longer duration, but both still running for a long period of time. We think that consideration of a difference in remote maturities does not substantially affect the normal investor in bonds, otherwise identical. Plainly, such remote maturity is much less important to him than rate of interest or return on his investment, certainty of payment, value, and the other characteristics identical in the bonds herein considered. All other things being equal, the only consideration reasonably important or practical to the normal investor seems the permanence of his investment, and there is, we think, no substantial difference in permanence

818

of investments of approximately sixteen years life, to be found only in a difference of four or ten months in length of life of bonds. Indeed the particular investor here was obviously not materially or substantially affected by the difference in maturity, since he paid the same unit price for bonds as received by him for bonds of a different maturity, and otherwise identical. As to the obligor, it is apparent that the difference in maturities is of importance analogous to that to the investor, and that such difference in remote maturities is not substantially important in comparison with the other characteristics such as interest rate and amount to be paid—the identical features in the bonds here; yet it is easily conceivable that circumstances might, from obligor's standpoint, make material difference between bonds differing not greatly in their duration. For example, the maturity of other onerous bonds between the two dates of maturity being considered might render obligor less able to meet the bonds last maturing. Such events or circumstances, however, and not the mere difference in maturity dates, would effect the difference in the bonds, and the certainty or imminence of such concrete events has not been shown by the petitioner herein. We are therefore as to position of both obligor and obligee, in the absence of other proof, left to consider only the abstraction as to difference in maturity dates, a mathematical and quantitative element as above seen, and one which in amount, by parity of reasoning in the cases above noted, has been found insufficient to overcome a determination of substantial identity. Such slight and remote disparity in maturity as here appears can not be said alone to negative the fact that in the main the bonds possess identity. We conclude under the facts herein that petitioner has not shown that the Philadelphia bonds in question were not substantially identical and in that respect respondent's determination is approved.

### The Omaha Land Bank Bonds.

Here again we consider sale and purchase of bonds issued by the same obligor. Those sold matured July 1, 1953, with privilege of redemption on or after July 1, 1933; those purchased matured January 1, 1956. The record does not indicate as to whether they contained the same provision as to redemption after July 1, 1933, nor does it contain the dates of issuance of either the bonds sold or those purchased. Therefore, respondent's determination of substantial identity being presumed correct, we assume the bonds to be identical in all particulars except date of maturity, petitioner not having shown to the contrary, and having in fact suggested no other difference in the bonds other than difference in maturity date. The bonds sold had approximately twenty and one-half years yet to run; those purchased had approximately twenty-three years yet to run, a

difference in maturity dates of two and one-half years; but both, we must assume, were subject to redemption at any time on or after July 1, 1933, at the option of the issuing Land Bank. They were issued pursuant to the same statutory authority, which provides for redeemability after not more than ten years from issuance (Sec. 861, ch. 7, Title 12, U. S. Code Annotated), and the officials issuing the bonds are presumed to have obeyed the statute. Were the bonds purchased "substantially identical" with those sold on December 14, 1932? If there was an unconditional positive difference of two and one-half years in the maturity or redeemability of the bonds a more difficult question as to the substantiality of the difference might arise, but here, on December 14, 1932, there were sold and purchased, for the same unit price, bonds all of which were subject to redemption after July 1, 1933, and in all respects identical except that if not redeemed at any time after July 1, 1933, those sold would be payable July 1, 1953, those purchased payable January 1, 1956. Was there, applying the definition above approved, because of a difference of two and one-half years in ultimate maturity of the bonds, a difference "in the main" or substantially? In our opinion the element of redeemability after July 1, 1933—only six months, approximately, from date of sale and purchase—was much more important to the ordinary purchaser of these bonds and to the obligor than the date of ultimate maturity. So far as life or duration of the bonds was concerned, to the ordinary investor and obligor, we believe the main characteristic was the possibility of redemption, at any time after a few months after the sale and purchase here concerned. Payment is obviously the prime and most important element of a bond. An obligation which may be paid at any time within the option of the obligor is treated and valued accordingly, and when such option is exercisable at any time within almost the entire period of twenty and one-half or twenty-three years the bonds have yet to run, the bonds are plainly in their most important aspect, in the same category—they are, in the main, or substantially, identical. We conclude, therefore, that the Omaha Land Bank bonds sold and those purchased were substantially identical, within the purview of section 118 (c) of the Revenue Act of 1932.

*Louisville Federal Land Bank Bonds Sold; St. Louis and Wichita Federal Land Bank Bonds Purchased.*

Here a third situation is to be considered. The bonds of one Federal Land Bank were sold and on the same day purchase was made of the same par value amount of Federal Land Bank bonds, at the same unit price and bearing the same rate of interest as the bonds sold, but issued by two other Federal Land Banks.

We think that fact establishes essential and substantial difference. Respondent argues that all Federal Land Banks are alike liable upon the bonds of each. If such liability were essentially or substantially the same as to each Land Bank, regardless as to which issued the bonds in question, such contention would no doubt be sound. But under the statutes providing for such bonds such liability does not appear. Indeed the very fact that the twelve Land Banks may issue consolidated bonds (sec. 875–879, ch. 7, Title 12, U. S. Code Annotated) which shall be the "joint and several obligation of the twelve Federal Land Banks" indicates that the liability of other banks than the issuing bank, as to other than consolidated bonds, is not substantially identical. These are not consolidated bonds. Other statutes show that as to the bonds here involved the liability of other banks is not joint and several, but is contingent only and not essentially the same as that of the issuing bank. Section 872 provides that the issuing bank is primarily liable, and that the other Federal Land Banks are liable only for interest payable by the issuing bank only in case of its default, and for the portion of the principal unpaid after application of the assets of the issuing bank; such liability of the other banks, however, to be only in proportion to the amount of farm loan bonds which each may have outstanding at the time of assessment of liability against it by the Farm Credit Administration, because of the liability above described through the default of the issuing bank. It is plain that such liability of other banks is not by any means the primary liability borne by the issuing bank, but that it is essentially and substantially different. We therefore conclude and hold that the bonds of the St. Louis and Wichita Federal Land Banks were not substantially identical with those of the Louisville Federal Land Bank, and therefore that deductible capital loss was suffered by petitioner as to the sale of the Louisville Federal Land Bank bonds; but that the losses incurred in sale of the Philadelphia and Omaha Federal Land Bank bonds are not deductible, under the provisions of section 118 (a) of the Revenue Act of 1932.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

STERNHAGEN, dissenting: While it can not be seriously denied that the bonds sold and the bonds purchased were in several respects similar, it seems to me that this does not bring them within the statutory denial of deduction. The dominant word underlying the denial is the word "identical", and I think this may not be overridden by emphasizing the qualifying word "substantially." When words of

such plain meaning are used in legislation in order to restrict deductions which are otherwise allowable, I think they should not be interpreted so as to give them a meaning which they do not have. Throughout the revenue acts Congress has chosen to use the words "similar", "like", and "equivalent" [1] frequently enough to indicate that the use of the word "identical" in this instance was not inadvertent. In the statement of the Treasury's representative, Adams, before the Senate Finance Committee, preceding the enactment of the Revenue Act of 1921, in which the provision first appears, he said that if a taxpayer "changes from one form of Liberty bonds to another form of Liberty bonds, or sells United States Steel and buys New York Central, he can take his loss under this provision." (Hearings before Committee on Finance on H. R. 8245, 67th Cong., 1st sess., p. 52). The rulings of the Bureau from that time on seem to me to indicate a consistent administration of the statute which treats a difference in maturity date of bonds as disproving that they were "substantially identical." To hold otherwise, as the present decision does, is to adopt such an elusive, impressionistic rule as to be practically impossible of the undiscriminatory uniformity with which a tax law should be administered. The present opinion seems to provide a caveat if the disparity between maturity dates of otherwise similar bonds is wide enough, but it supplies no satisfactory standard which will enable either taxpayers or administrators to say with any assurance whether the loss in any case is deductible or not.

BLACK and LEECH agree with this dissent.

---

[1] Revenue Act of 1913, sec. II; Revenue Act of 1916, sec. 13 (e); Revenue Act of 1917, sec. 1208; Revenue Act of 1921, secs. 202 (c), 214 (a) (12); Revenue Act of 1932, secs. 112 (b) (1), (5), 115 (g) g 143, 212 (b), 231 (b).